Indiana QUADRA et al., Plaintiffs,

v.

SUPERIOR COURT OF the CITY AND
COUNTY OF SAN FRANCISCO
et al., Defendants.

No. C–72–1689.

United States District Court,
N. D. California.

May 16, 1974.

Albert F. Moreno, Sidney M. Wolinsky, Public Advocates, Inc., San Francisco, Cal., for plaintiffs.

Thomas M. O'Connor, City Atty., George E. Krueger, Deputy City Atty., San Francisco, Cal., for defendants.

Evelle J. Younger, Atty. Gen., San Francisco, Cal., Edward A. Hinz, Jr., Chief Asst. Atty. Gen., Doris H. Maier, Asst. Atty. Gen., Derald E. Granberg, Clifford K. Thompson, Jr., Deputy Attys. Gen., for amicus curiae.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Plaintiffs have brought this action to challenge the process of selecting members of the grand jury for San Francisco County. Defendants are the Superior Court of the City and County of San Francisco, the judges of that court, and an executive officer of the court who serves as jury commissioner. They invoke the jurisdiction of this Court under 28 U.S.C. §§ 1343, 2201, and 2202, and the doctrine of pendent jurisdiction, and ask for injunctive and declaratory relief.

Plaintiffs' essential claim is that the "personal-selection" system used by defendants in selecting grand jurors in San Francisco has resulted in the "systematic exclusion" of non-white ethnic minorities, women, residents of "lower-strata neighborhoods of the city," low-income blue-collar workers, and "young adults," persons between the ages of twenty-one and forty. Plaintiffs seek to maintain this lawsuit as a class action under Rule 23(b)(2), Federal Rules of Civil Procedure, in terms of these five classes.

In their complaint, plaintiffs allege three causes of action:

█ 1. They contend that the policies and practices of defendants deny them an equal opportunity to qualify for grand-jury service in violation of 18 U.S.C. § 243. That section, however, is a criminal provision prohibiting the exclusion of persons from service on federal or state grand or petit juries "on account of race, color, or previous condi-

tion of servitude * * *" and does not provide the basis for a civil suit. Quarles v. State of Texas, 312 F.Supp. 835, 837 (S.D.Tex. 1970). *Cf.* Agnew v. City of Compton, 239 F.2d 226, 230 (9th Cir. 1956), cert. denied, 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957). The first cause of action must, therefore, be dismissed.

█ 2. Plaintiffs' second cause of action is a claim that defendants have violated 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment by arbitrarily denying them an equal opportunity to participate on the grand jury. The Superior Court, however, is not a "person" under § 1983 and must be dismissed from this cause of action. Zuckerman v. Appellate Div., Sec. Dept., S.Ct. of N.Y., 421 F.2d 625, 626 (2nd Cir. 1970); Clark v. State of Washington, 366 F.2d 678, 681 (9th Cir. 1966); Harris v. Louisiana State Supreme Court, 334 F.Supp. 1289, 1299–1300 (E.D.La. 1971); Schackman v. Arnebergh, 258 F.Supp. 983, 993 (C.D. Cal. 1966), appeal dismissed, 387 U.S. 427, 87 S.Ct. 1622, 18 L.Ed.2d 865 (1967), rehearing denied, 389 U.S. 893, 88 S.Ct. 16, 19 L.Ed.2d 204 (1967). *See also* City of Kenosha v. Bruno, 412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492, 505–07 (1961).

█ This cause of action may proceed, however, as a claim for injunctive and declaratory relief against the individual defendants in their official capacities. Erdmann v. Stevens, 458 F.2d 1205, 1208 (2nd Cir. 1972), cert. denied, 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972); Law Students Civil Rights Research Coun., Inc. v. Wadmond, 299 F.Supp. 117, 123–124 (S.D.N.Y. 1969) (Friendly, J.), aff'd, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) (without review of this § 1983 issue: see 401 U.S. at 158, n. 9); Martarella v. Kelley, 349 F.Supp. 575, 593–594 (S.D.N.Y. 1972). *Cf.* Pierson v. Ray, 386 U.S. 547, 553–554, 87 S.Ct. 1213, 18 L.Ed.2d 288

(1967); Silver v. Dickson, 403 F.2d 642, 643 (1968), cert. denied, 394 U.S. 990, 89 S.Ct. 1477, 22 L.Ed.2d 765 (1969).

3. Plaintiffs' third cause of action is based upon Article I, §§ 11 and 21, of the California Constitution. They contend that defendants, through their policies and practices of grand-jury selection, have denied plaintiffs' five classes of persons equal consideration for grand-jury service and that no rational or legitimate state objective justifies this denial.[1]

Plaintiffs' application for a preliminary injunction seeking to enjoin defendants from selecting the members of the 1973 grand jury was denied orally by the Court because of plaintiffs' failure to prosecute their application in a timely manner. They have also asked for a declaratory judgment that their federal and state civil rights have been violated by defendants, for permanent injunctive relief, for their costs and reasonable attorney's fees, and for any further necessary relief.

Defendants have moved for dismissal on the grounds of plaintiffs' failure to state a cause of action upon which relief can be given and, alternatively, for summary judgment. Plaintiffs have also moved for summary judgment and, alternatively, for partial summary judgment.

The State of California has, upon the invitation of the Court, appeared in these proceedings as amicus curiae.

## I. The Grand-Jury Selection Process

A state grand jury in California is composed of twenty-three members in a county with a population exceeding four million and, as in San Francisco, of nineteen members in counties with populations of less than four million. Cal.Penal Code § 888.2. A person is competent for grand-jury service only if (1) he is a United States citizen aged eighteen years or older who has been a resident of California and of the county or city and county for at least one year immediately before being selected and returned; (2) "[h]e is in possession of his natural faculties, of ordinary intelligence, of sound judgment, and of fair character"; and (3) he is sufficiently knowledgeable of the English language. Cal.Penal Code § 893(a). A person is not competent to serve if he is serving as a trial juror in any court of the State, if he has been discharged as a grand juror by a State court within one year prior to the time for selection, if he has been convicted of "malfeasance in office" or of a felony or "other high crime," or if he is serving as an elected public officer. Cal.Penal Code § 893(b).

There are essentially two different systems of selecting grand jurors provided for under the California statutes. Both systems begin with an order by each superior court in January of each year designating the estimated number of grand jurors that will be needed during the ensuing year. Cal.Penal Code § 895. Then, under one system, the court must select the members of the grand jury through personal interviews. If the court finds that a person has the requisite qualifications, then, for his name to be listed, that person must sign a statement to the effect that he will be available for the number of hours required for grand-jury service. Cal. Penal Code § 896(a). The court must then "list the persons so selected and required by the order to serve as grand jurors during the ensuing year, or until a new list of grand jurors is provided, and shall at once place this list in the possession of the county clerk." Cal. Penal Code § 896(b). The county clerk then chooses the grand jurors from this list by lot. Cal.Penal Code §§ 900, 902.

The other statutory system, the one applicable to San Francisco, covers counties in which an officer performs the duties of a jury commissioner. Cal.Penal Code § 903. Following written rules and

---

[1]. See p. 627, *infra*, for a discussion of this third cause of action and the doctrine of pendent jurisdiction.

instructions adopted by a majority of the judges of the superior court, the jury commissioner is to furnish the judges each year with a list of persons qualified to serve on the grand jury. Cal.Penal Code § 903.1. The jury commissioner is first to make a diligent inquiry into the qualifications of county residents. Cal.Penal Code § 903.2.[2] He then recommends to the judges a list of persons from which the judges select the grand jurors. Cal.Penal Code § 903.3. However—

"The judges are not required to select any names from the list returned by the jury commissioner, but may, if in their judgment the due administration of justice requires, make all or any selections from among the body of persons in the county suitable and competent to serve as grand jurors regardless of the list returned by the jury commissioner." Cal.Penal Code § 903.4.

In San Francisco, however, as the process has been described by defendants,[3] the jury commissioner does not initially provide the judges with a list of persons that he has found to be qualified. Instead, the jury commissioner asks the judges to submit the names of persons whom the judges have found to be interested and qualified for grand-jury service. Each of the twenty-six judges normally offers four or five names, or approximately 130 in total. The jury commissioner then sends questionnaires to those persons to determine their general qualifications for grand-jury service and their availability for

the amount of time required for service. When the questionnaires are returned, the jury commissioner prepares a list of the nominees which he submits to the judges. They review and approve a final list; they may delete names from the submitted list. The remaining names are given to the county clerk who, using the process prescribed by Cal.Penal Code § 900, places the names on individual pieces of paper, then puts them in capsules and seals them in a "grand jury box" from which thirty names are drawn. Those persons chosen are summoned and undergo a *voir dire* examination before the presiding judge who then selects the nineteen persons who will constitute the grand jury.[4]

During the pendency of this lawsuit, the Superior Court has drafted a "Proposed Rule re Grand Jury"[5] in which it "reaffirms its existing policy in regard to the selection of grand jurors * * *." That policy includes the prescriptions that "[e]ach judge shall make an adequate effort to acquaint himself with the qualifications of eligible jurors * * *" in order to avoid inclusion or exclusion of persons on the basis of their membership in "economic, social, religious, racial or sexual groups or classes in the community at large"; that "[t]he judges shall not stop with their personal acquaintances"; and that "[v]olunteers for service as grand jurors will receive equal consideration." The procedure described in the "Proposed Rule" seems to differ from that described by defendants earlier in this action and summarized above. This "Proposed Rule"

---

2. "The jury commissioner shall diligently inquire and inform himself in respect to the qualifications of persons resident in his county who may be liable to be summoned for grand jury duty. * * *."

3. Defendants' Memorandum filed November 15, 1972, pp. 7–9; Affidavit of Bernard J. Ward, dated November 14, 1972.

4. Although the selection process in San Francisco seems to deviate from the statutory scheme in that the jury commissioner does not submit an initial list to the judges, it is a

permissible procedure under state law. People v. Goodspeed, 22 Cal.App.3d 690, 699–701, 99 Cal.Rptr. 696, 702–704 (1972); In re Wells, 20 Cal.App.3d 640, 650–651, 98 Cal. Rptr. 1, 7 (1971); People v. Newton, 8 Cal. App.3d 359, 388, 87 Cal.Rptr. 394, 413 (1970); cf. People v. Teitelbaum, 163 Cal. App.2d 184, 201–204, 329 P.2d 157, 170 (1958) (under predecessor statutes), appeal dismissed, 359 U.S. 206, 79 S.Ct. 738, 3 L. Ed.2d 759 (1959).

5. See Appendix C to this opinion.

is to be used by the judges in impanelling the 1974 Grand Jury, which is expected to take place sometime in July, 1974.

## II. The Three-Judge Court Requirement

Defendants and the State both urge that, if the Court finds that plaintiffs have raised a substantial constitutional challenge to the grand-jury selection system in San Francisco, a three-judge district court must be convened pursuant to 28 U.S.C. § 2281. Although plaintiffs contend that their attack is directed at the application of Cal.Penal Code § 903.-4 [6] in San Francisco, defendants and the State argue that the statute itself is challenged since it authorizes the type of selection process followed in San Francisco.

If plaintiffs were contending that § 903.4 is unconstitutional on its face, this Court would have no difficulty in dismissing the action without convening a three-judge court on grounds of insubstantiality. See Goosby v. Osser, 409 U.S. 512, 518–522, 93 S.Ct. 854, 858–61, 35 L.Ed.2d 36, 42–45 (1973); cf. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). This statute "is not in itself unfair; it is capable of being carried out with no racial discrimination whatsoever. But by reason of the wide discretion permissible in the various steps of the plan, it is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable." Smith v. Texas, 311 U.S. 128, 130–131, 61 S.Ct. 164, 165–66, 85 L.Ed. 84, 86–87 (1940) (footnote omitted). It was the application of the statute, and not the statute on its face, which was found to result in an unconstitutional conviction in Smith v. Texas, 311 U.S. at 131–132. More recently, the Supreme Court refused to invalidate a state statute conferring considerable discretion on local officials when the application of the statute by those officials had been found to be unconstitutional.

Carter v. Jury Commission of Greene County, 396 U.S. 320, 331–337, 90 S.Ct. 518, 523–27, 24 L.Ed.2d 549, 558–62 (1970).

Moreover, in this case, the State statutes have been upheld by State courts against constitutional attack. See In re Wells, 20 Cal.App.3d 640, 649, 98 Cal. Rptr. 1, 6 (1971); People v. Newton, 8 Cal.App.3d 359, 388–389, 87 Cal.Rptr. 394, 413 (1970).

Here the Court finds that plaintiffs' claims are not insubstantial, and since they are directed not at § 903.4 itself but rather at the local selection of grand jurors, a three-judge court is not required.

In the companion case to Carter v. Jury Commission, supra, in which an injunction had been sought prohibiting enforcement of the statutes governing selection of the county board of education and grand jury, the Supreme Court, in holding that a three-judge court had been required, explained that the relief sought was the determining factor on this issue:

"The appellees also propose a distinction between attacks on statutes and attacks upon the results of their administration, and urge that the appellants' case comes within the latter category. But this argument overlooks the line, delineated by our past decisions, that falls between a petition for injunction on the ground of the unconstitutionality of a *statute,* either on its face or as applied, which requires a three-judge court, and a petition seeking an injunction on the ground of the unconstitutionality of the *result* obtained by the use of a statute not attacked as unconstitutional." Turner v. Fouche, 396 U.S. 346, 353–354, n. 10, 90 S.Ct. 532, 536–37, 24 L.Ed.2d 567, 574–75 (1970) (emphasis in original).

Plaintiffs in their complaint have not sought an injunction prohibiting the use of § 903.4 in selecting grand jurors in the State. Their claims are based upon

the *results* of the system used in San Francisco. The relief sought here would not result in a selection system inconsistent with § 903.4. Hence this case falls on the side of the Turner v. Fouche line not requiring a three-judge court. *See also* Blackwell v. Thomas, 476 F.2d 443, 444 (4th Cir. 1973) (single-judge district court where state statute not challenged).

■ This result is consistent with the rule that 28 U.S.C. § 2281 is not to be viewed "as a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such." Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800, 805 (1941). *See also* Swift & Co. v. Wickham, 382 U.S. 111, 124, 86 S.Ct. 258, 265, 15 L.Ed.2d 194, 203 (1965). It is also justifiable under the rule that only suits challenging statutes or regulations which have "statewide application" or effectuate "statewide policy" require three-judge courts. Bd. of Regents v. New Left Education Project, 404 U.S. 541, 542, 92 S.Ct. 652, 653, 30 L.Ed.2d 697, 700 (1972); Moody v. Flowers, 387 U.S. 97, 101–104, 87 S. Ct. 1544, 1547–49, 18 L.Ed.2d 643, 647–49 (1967). The actions challenged in this case were those of judicial officers of San Francisco County. This case will turn upon, and be limited to, the Court's evaluation of the specific facts pertaining to the selection process followed in San Francisco County. If plaintiffs were to prevail here, the Court's order would not extend to any other county;

nor would the Court's decision have res judicata effect on lawsuits challenging the selection systems in other counties. It may be that other superior courts in the State do follow selection procedures very similar to the procedure used by defendants, but the use of "a variety of different devices, working perhaps to the same end, still leaves any one device local rather than statewide for purposes of the statutory three-judge court." Moody v. Flowers, *supra,* 387 U.S. at 102.

### III. *The Applicable Legal Standards*

Plaintiffs, despite some caustic and apparently hyperbolic language in their complaint,[7] do not contend that the discrimination which they allege resulted from intentional biased selection by any of defendants.[8] Instead they base their claims upon statistical demonstrations [9] of disparities between the representation of each class upon the grand jury through the period 1960–1972 inclusive and its percentage of the population of the County eligible for grand-jury service.[10] They also maintain that the system used to select the grand jury had within it opportunity for discrimination by those using it.

It was only in Carter v. Jury Commission, *supra,* 396 U.S. 320, 329–330 (1970), that the Supreme Court had occasion to sanction lawsuits by persons claiming that they had been unconstitutionally excluded from grand-jury service. The same standards apply, however, whether a person is claiming

7. "Under-representation of non-whites in San Francisco compares with the most blatant cases of racism arising in the South." Complaint, p. 6. "The discrimination in this instance is unparalleled by the worst racial discrimination in the South." Plaintiffs' memorandum, filed September 20, 1972, p. 2.

8. "Plaintiffs have alleged that the exclusion is 'the direct consequence of the personal selection system', they have not alleged, nor even inferred, that the disparities result from the intent of the Superior Court judges to discriminate against said groups. Nor do plaintiffs question the 'good faith' protesta-

tions of the judges that they are affirmatively seeking to increase the participation of minorities and women on the grand jury. But, with all due respect, the judges [*sic*] subjective thoughts are irrelevant' in the face of the present substantial disparities." Plaintiffs' memorandum filed December 7, 1972, p. 1. See also *id.,* pp. 3–4.

9. See Appendix A for the yearly figures, as assembled by the Court from plaintiffs' pleadings.

10. See Appendix B for population data.

such exclusion from grand-jury service or whether one criminally accused challenges the grand jury that indicted him.[11] It is on the question of appropriate relief where such cases will diverge. In addition, "[t]he principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries * * *." Alexander v. Louisiana, 405 U.S. 625, 626, n. 3, 92 S.Ct. 1221, 1223, 31 L.Ed.2d 536, 539 (1972).

The legal standards applicable in this case will come in most instances from cases in which intentional exclusion was. not claimed and in which the courts were deciding federal constitutional issues and not utilizing their broad supervisory power over the federal criminal-justice system. See Fay v. New York, 332 U.S. 261, 287, 294–296, 67 S.Ct. 1613, 1627, 1630–31, 91 L.Ed. 2043, 2059–60, 2063–64, (1947). When, however, a federal court refuses to take a certain action under that supervisory power, it is evident that the requested action is also not a constitutional requirement.

■ Persons challenging grand-jury selection practices on the basis of statistical disparities must first establish which "identifiable groups" have been excluded. Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866, 870 (1954). Such groups can be other than black and white racial groups. "Whether such a group exists within a community is a question of fact", which can be answered, for example, by "the attitude of the community." 347 U.S. at 478, 479. Cf. Peters v. Kiff, 407 U.S. 493, 503–504, 92 S.Ct. 2163, 2169, 33 L. Ed.2d 83, 94–95 (1972) (opinion of Marshall, J.). See also Comment, The Civil Petitioner's Right to Representative Grand Juries and a Statistical Method of Showing Discrimination in Jury Selection Cases Generally,

20 U.C.L.A.L.Rev. 581, 590–591 (1972–73). Plaintiffs here have alleged five such identifiable groups.

■■ After establishing the appropriate identifiable groups, those challenging the selection system must offer evidence showing a prima facie case of unconstitutional exclusion. It has long been the law that evidence showing a great disparity between the representation of a group over time on the grand jury and its percentage of the eligible population can be sufficient to establish a prima facie case. See Norris v. Alabama, 294 U.S. 587, 591, 55 S.Ct. 579, 581, 79 L.Ed. 1074, 1077 (1935). But there are limits to the use of statistics alone to make a prima facie case. "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, 766 (1965). It is significant that in *Swain*, although the Court found "no studied attempt to include or exclude a specified number of Negroes", it did note that "the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented." 380 U.S. at 209. The general principle is that identifiable groups are not entitled to a perfect system of proportional representation on state grand juries. *Swain, supra,* 380 U.S. at 208–209; Cassell v. Texas, 339 U.S. 282, 286–287, 70 S.Ct. 629, 631–32, 94 L.Ed. 839, 847 (1950) (plurality opinion of Reed, J.); Akins v. Texas, 325 U.S. 398, 403–406, 65 S.Ct. 1276, 1279–80, 89 L.Ed. 1692, 1696–98 (1945); Thomas v. Texas, 212 U.S. 278, 283, 29 S.Ct. 393, 394, 53 L.Ed. 512, 514 (1909).

*Swain, supra,* decided only what percentage disparity standing alone would

---

11. "People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion." *Carter, supra,* 396 U.S. at

329 (footnote omitted). The Court relied in *Carter,* upon earlier cases in which a criminal defendant had challenged grand jury. 396 U.S. 334–336.

be insufficient for a prima facie case. Further guidance was given by Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567, 579 (1970):

"[A]ppellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole [60%] and of Negroes on the newly constituted jury list [37%]. They further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria [disqualifying persons as "unintelligent" and not "upright"]. The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it." (footnote omitted)

Thus the combination of a disparity of 23% arising in large part from the subjective judgment of the selectors is sufficient for a prima facie case.[12]

The rules governing the establishment of a prima facie case of jury discrimination were further refined by Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), in which a conviction was challenged. There 21.06% of the relevant population was black. The selection system utilized questionnaires which were sent to persons on a list compiled from various public listings (e. g., telephone directory, voter registration rolls). Of the questionnaires returned, only 13.76% were from blacks. The jury commissioners then attached an information card to each questionnaire which included a designation of the person's race. The commissioners next eliminated questionnaires of those persons they found to be not qualified or exempt. Of the remaining group, 6.75% were black. Finally, from this group, twenty grand jurors were selected of whom only one (5%) was black. The Court found it statistically improbable that the reduction of blacks was the result of a permissible process, but did not rest its finding of a prima facie case upon "statistical improbability alone." 405 U.S. at 630. The use of the racial designations was critical in that it constituted a "clear and easy opportunity for racial discrimination" (although there was no evidence of intentional discrimination) which, when combined with the statistical evidence, was sufficient to make out a prima facie case. 405 U.S. at 630–632. Therefore, when viewed in the factual context of *Alexander*, a 16% disparity plus an opportunity to discriminate, became enough for a prima facie case.[13] *Alexander* also points up the significance of each stage of a selection process and the progressive reduction of percentage representation of a sizeable group beginning with the eligible population and ending with the grand jury.

Once a prima facie case has been established, it falls upon the responsible officials to explain the statistical disparities by demonstrating that permissi-

---

12. *See also* Whitus v. Georgia, 385 U.S. 545, 550–552, 87 S.Ct. 643, 646–48, 17 L.Ed.2d 599, 603–05 (1967); Sims v. Georgia, 389 U.S. 404, 407–408, 88 S.Ct. 523, 525–26, 19 L.Ed.2d 634, 637 (1967); Jones v. Georgia, 389 U.S. 24–25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25, 26–27 (1967).

13. *See also* Blackwell v. Thomas, 476 F.2d 443, 446–447 (4th Cir. 1973) (disparities of 6%, 9%, and 12% in three consecutive years sufficient, along with opportunity for systematic exclusion, to call for evidentiary hearing of how jury-selection statutes are administered); Smith v. Yeager, 465 F.2d 272, 278, 281 (3rd Cir. 1972), cert. denied *sub nom.* New Jersey v. Smith, 409 U.S. 1076, 93 S.Ct. 685, 34 L.

Ed.2d 665 (1972) (prima facie case established by 19% disparity between black representation on grand-jury lists and blacks' percentage of county population plus opportunity to discriminate in selection process).

In Blackwell v. Thomas, *supra*, 476 F.2d at 447, n. 7, the court provides a useful explanation of the current status of the *Swain, supra,* decision: "If the disparity proceeds from objective criteria, i. e., age, educational attainment, registration to vote, etc., the 10% test of *Swain* may be safely employed. But if the disparity proceeds from the application of subjective tests, under which there is wide opportunity for intentional racial discrimination, the tolerable disparity is diminished."

ble, neutral selection criteria and methods have caused the disparities. This is a shift in the burden of proof. See *Alexander, supra,* 405 U.S. at 631–632. Possible explanations may be in terms of the use of objective, impartial educational qualifications [14] or other neutral qualifications and exemptions. *See* Stephens v. Cox, 449 F.2d 657, 661 (4th Cir. 1971); *cf.* Rawlins v. Georgia, 201 U.S. 638, 640, 26 S.Ct. 560, 50 L.Ed. 899, 900 (1906). The statistical basis for the challenge could also be attacked, either by a showing of inaccurate or incomplete data, or by demonstrating that the actual disparity could have resulted from accident or chance. *Cf.* Scott v. Walker, 358 F.2d 561, 568 (5th Cir. 1966) (en banc).

The Supreme Court has indicated what explanations are insufficient to rebut a prima facie case of grand-jury discrimination. "[A]ffirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536, 543 (1972). Testimony of those administering the selection process "that they included or excluded no one because of race did not suffice to overcome * * * " [a] prima facie case. Turner v. Fouche, 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567, 579 (1970). *See also* Carmical v. Craven, 457 F.2d 582, 587 (9th Cir. 1971), cert. denied, 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972). A selection process that is consistent with local traditions and "the general thinking of the community" is not thereby insulated from constitutional challenge. Eubanks v. Louisiana, 356 U. S. 584, 588, 78 S.Ct. 970, 973–74, 2 L.Ed. 2d 991, 994 (1958). Nor can a system based upon the selectors' personal acquaintances be justified by the fact that those selectors knew none of the excluded group who could qualify in the absence of evidence of compliance with the selectors' "duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color." Cassell v. Texas, 339 U.S. 282, 289, 70 S.Ct. 629, 633, 94 L.Ed. 839, 848 (1950) (plurality opinion of Reed, J.); *see also* Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559, 1562 (1942); Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84, 87 (1940); Salary v. Wilson, 415 F.2d 467, 471–472 (5th Cir. 1969); Brooks v. Beto, 366 F.2d 1, 22–23 (5th Cir. 1966) (en banc), cert. denied 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135, rehearing denied, 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618 (1967). Clearly, generalities in rebuttal will not suffice; specific factual or legal explanations are necessary. *Cf.* Norris v. Alabama, 294 U.S. 587, 598, 55 S.Ct. 579, 583–84, 79 L.Ed. 1074, 1081 (1935).[15]

---

14. An educational qualification, in a particular historical, social context, may not be neutral. *See* Turner v. Fouche, 396 U.S. 346, 361, n. 22, 90 S.Ct. 532, 541, 24 L.Ed.2d 567, 579 (1970). The Court of Appeals for this Circuit has held that it is constitutionally impermissible to use an intelligence or "clear thinking" test that does not measure average intelligence and that includes a cultural bias. Carmical v. Craven, 457 F.2d 582, 588 (9th Cir. 1971), cert. denied, 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972).

15. The parties have argued whether the "strict scrutiny" or "rational relationship" test of equal-protection analysis should be applied in this case. But the authorities do not use the usual equal-protection terminology. Rather, as indicated above in the text, the emphasis has been on what types of explanation will or will not suffice in rebuttal. With the focus thus on the specifics of each attempted rebuttal, the issue of which label should be applied loses significance. *But see* United States v. Butera, 420 F.2d 564, 569 (1st Cir. 1970); Comment, 20 U.C.L.A.L.Rev. 581, 598–599 (1972–73). The view in *Butera, supra,* may be the result solely of the lenient stance adopted by the Supreme Court in Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), with respect to special procedures governing the participation of women which amounted to an intentional limitation of women serving on the grand jury. That lenient stance is probably no longer tenable. See pp. 618–619, *infra.*

The concentration by the courts on the specifics of each rebuttal has still left room for disagreement about what constitutes sufficient rebuttal. *See,* for instance, the lenient

With these legal principles, then, the Court will proceed to examine plaintiffs' allegations to determine whether, if true, they state prima facie cases of grand-jury discrimination for each of the five classes.

## IV. *Plaintiffs' Allegations of Prima Facie Cases*

The Court finds initially that the selection system in San Francisco as described by defendants does contain opportunities to discriminate. First, the judges submit the names of persons they have found to be interested and qualified for grand-jury service. Second, the judges review and approve a final list of nominees. Third, the final selection is by the presiding judge after *voir dire*.[16] There is clearly opportunity to discriminate at each of these stages.[17] Therefore, the Court's consideration of plaintiffs' statistics will not be limited by the "objective" *Swain* ruling that a 10% disparity is not substantial in itself. Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759, 766 (1965).

### A. *Non-white Ethnic Minorities*

Plaintiffs seek to represent a class of non-white ethnic minorities. Although the generality of the class description would seem to include all non-white ethnic minorities, plaintiffs also allege in the complaint underrepresentation of three more specific groups:[18] blacks, Asians, and "Latinos" (presumably referring to persons of Latin-American descent or those with Spanish surnames).

Racial groups are the most clearly defined "identifiable" groups for the purposes of equal-protection analysis. *See* Strauder v. West Virginia, 100 U.S. 303, 310, 25 L.Ed. 664, 666 (1879); Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, 227 (1886). In addition, persons of Latin-American ethnic origin are probably also an identifiable group. Hernandez v. Texas, 347 U.S. 475, 479–480, 74 S.Ct. 667, 671, 98 L.Ed. 866, 870–71 (1954) (persons of Mexican descent). *See also* Oyama v. California, 332 U.S. 633, 647, 68 S.Ct. 269, 276, 92 L.Ed. 249, 259 (1948). Since each of these sub-groups is probably an identifiable group, the combination of the three into one group is permissible for the purposes of statistical allegations.[19]

Plaintiffs allege that non-white ethnic minorities comprise 32.3% of the

---

approach to rebuttals in United States ex rel. Chestnut v. Criminal Ct. of City of N. Y., 442 F.2d 611, 617–618 (2nd Cir. 1971), cert. denied, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed. 2d 98 (1971), and in Carrington v. Slayton, 359 F.Supp. 189, 193 (W.D.Va. 1973). *Compare* Muniz v. Beto, 434 F.2d 697, 703 (5th Cir. 1970).

16. Plaintiffs have also argued that the use of the *voir dire* conflicts with Cal.Penal Code § 908 which prescribes selection by lot of the nineteen grand jurors if more than nineteen names appear in the final pool. See Reporter's Transcript of the Proceedings of April 9, 1973, pp. 34–38. The "Proposed Rule" does not contain a *voir dire* procedure. See Appendix C.

17. The "Proposed Rule" includes a provision for accepting volunteers. That introduces another opportunity for discrimination in that different identifiable groups may have different propensities and motivations for volunteering. This is particularly so when it is kept in mind that each grand juror is obli-

gated to attend meetings every Monday evening and Thursday morning for 52 consecutive weeks. Reliance on a volunteer system may conflict with the selectors' duty to know "the qualifications of the eligible jurors of the county * * *." Cassell v. Texas, 339 U.S. 282, 289, 70 S.Ct. 629, 633, 94 L.Ed. 839, 848 (1950). *But see* United States ex rel. Chestnut v. Criminal Ct. of City of N. Y., 442 F.2d 611, 618 (2nd Cir. 1971), cert. denied, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed.2d 98 (1971).

18. The population percentages which plaintiffs offer would indicate that the class of non-white ethnic minorities is composed entirely of those three groups. See the figures cited, *infra*, in the text.

19. Under Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866, 870 (1954), the existence of an "identifiable group" is a factual matter which must be determined initially in a case of alleged grand jury discrimination. The Supreme Court in *Hernandez* seems to presume that racial

population eligible for grand-jury service but comprised only 7.6% of the grand jurors chosen over the period 1960–1972. In addition, over the same period, people of Latin-American descent, 9.5% of the eligible population, have had only one grand juror; Asians, 9.4% of the population, have accounted for 2.3% of the grand jurors; and blacks, 13.4% of the population, have accounted for 4.8% of the grand jurors. The 1973 grand jury, selected after this action was filed, contains among its nineteen members four or five persons of non-white ethnic origin (21 or 26%), including three blacks (16%) and one or two persons of Latin-American descent (5 or 11%).[20]

If plaintiffs' statistical allegations are true, they have stated a prima facie case of discrimination.[21] With respect to non-white ethnic minorities, therefore, they have stated a claim upon which relief can be given, and defendants' motion to dismiss will be denied.

### B. *Women*

Whether women are an identifiable group for the purposes of a case of alleged grand-jury discrimination based upon statistical disparities was a question left unanswered by the Supreme Court in Alexander v. Louisiana, 405 U. S. 625, 633–634, 92 S.Ct. 1221, 1227, 31 L.Ed.2d 536, 544 (1972). *But see* 405 U.S. at 634–644 (Douglas, J., concurring). In Frontiero v. Richardson, 411 U.S. 677, 682, 93 S.Ct. 1764, 1767, 36 L. Ed.2d 583, 589 (1973) (plurality opinion of Brennan, J.), four justices concluded that classifications based upon sex are suspect. *Cf.* Reed v. Reed, 404 U.S. 71, 76–77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 229–30 (1971). *See also* Wiesenfeld v. Secretary of Health, Education & Wel-

groups are identifiable; that presumption would clearly be warranted under judicial notice of obvious sociological facts throughout this nation. In this case, there is little doubt in this Court's mind that persons of Latin-American descent and of Chinese and Japanese ethnic origin are identifiable groups within San Francisco. But the Supreme Court did analyze evidence in *Hernandez* that persons of Mexican descent were an identifiable group, and did not have before it the question of whether judicial notice of that fact could be taken. 347 U.S. at 479–480 and n. 9.

The Court need not rule on this issue at this time. Plaintiffs' allegations are sufficient to survive a motion to dismiss. At a pretrial hearing or at the evidentiary hearing in this case, the issue of whether judicial notice can be taken that persons of Asian descent are either an identifiable racial or ethnic group and that persons of Latin-American descent are an identifiable ethnic group in San Francisco will have to be confronted. If judicial notice cannot be taken of these facts, plaintiffs will have the burden of proof of establishing these classes as identifiable groups. *Cf.* United States v. De Alba-Conrado, 481 F.2d 1266, 1270, n. 7 (5th Cir. 1973). Plaintiffs should attempt a more specific definition of these classes in terms of specific ethnic groups (e. g., Mexican-Americans, Chinese-Americans). The determination of whether plaintiffs can pursue this claim as a class action will be deferred until these issues are settled. (On the possi-

bility that the question of whether a particular class is an "identifiable group" is closely related to whether the class is appropriate under Rule 23, Federal Rules of Civil Procedure, *see* Tijerina v. Henry, 398 U.S. 922, 924–925, 90 S.Ct. 1718, 1720–21, 26 L.Ed.2d 86, 87 (Douglas, J., dissenting from dismissal of appeal)). *See also* footnote 23, *infra*.

20. The parties differ on the ethnic background of one grand juror with a Spanish surname. The percentages are approximate.

21. These statistical allegations are a part of plaintiffs' burden of proof. The Court has assumed that the statistics are accurate only for the purposes of ruling on the motion to dismiss, and it does find certain defects in them. See pp. 624–625, *infra*.

Plaintiffs have not used official records as a basis for their allegations and claim that they "lacked access to official data containing the information * * *." Affidavit of Carol Levine, dated September 15, 1972. The file in this case does not reveal any efforts by plaintiffs to discover any of the official documents or to request admissions from defendants concerning them. *Cf.* United States v. Wiman, 304 F.2d 53, 61–5 (5th Cir. 1962), cert. denied, 372 U.S. 915, 83 S.Ct. 717, 9 L.Ed.2d 722 (1963). But defendants also have not submitted official statistics or records bearing on plaintiffs' allegations. It is clear that at some point in these proceedings statistics based upon the official data must be submitted to this Court.

fare, 367 F.Supp. 981, 990–991 (D.N.J. 1973) (sex classification inherently suspect). In the wake of these developments, this Court anticipates that in the future the Supreme Court will not take the lenient stance toward state procedures which tend to limit significantly the number of women serving as grand jurors or present in grand-jury pools which it assumed in Hoyt v. Florida, 368 U.S. 57, 60, 61–62, 68–69, 82 S.Ct. 159, 161–62, 162, 166, 7 L.Ed.2d 118, 121, 121–22, 125–26 (1961); in Fay v. New York, 332 U.S. 261, 289–290, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); and in Strauder v. West Virginia, 100 U.S. 303, 310, 25 L.Ed. 664, 666 (1879).[22] *See* Healy v. Edwards, 363 F.Supp. 1110, 1117 (E.D.La. 1973), prob. jur. noted, 415 U.S. 911, 94 S.Ct. 1405, 39 L.Ed.2d 465 (1974); *but cf.* Marshall v. Holmes, 365 F.Supp. 613, 617–618 and n. 2 (N.D. Fla.1973). Thus there seems to be a substantial probability that women are an identifiable group for the purposes of this litigation.[23]

Once it is determined that a particular class is an identifiable group in the community, the same rules govern-

ing statistical allegations of discrimination used in cases of alleged racial discrimination should apply. *Cf.* Blackwell v. Thomas, 476 F.2d 443, 446–447 (4th Cir. 1973).

Plaintiffs allege that women, despite being 53% of the eligible population in San Francisco, have comprised only 13% of the grand-jury array and 12% of the grand jurors selected over the years 1960–1972. The 1973 grand jury has five women as members (26%).

The allegations of plaintiffs, if true, show a statistical disparity sufficient to state a prima facie case. Defendants' motion to dismiss will be denied as to the claim of sexual discrimination.[24]

## C. Residents of Lower-Strata Neighborhoods

The third alleged class which plaintiffs seek to represent is comprised of residents of lower-strata neighborhoods. Plaintiffs allege that discrimination against this group through the selection process "is indicative of geographic as well as wealth and race discrimination because of the heavy concentration of poor non-whites in the lower-strata

---

**22.** Federal courts have taken a much different attitude toward the participation of women on grand juries in wielding their federal supervisory power. *See* Ballard v. United States, 329 U.S. 187, 193–194, 67 S.Ct. 261, 264, 91 L.Ed. 181, 185–86 (1946); United States v. Butera, 420 F.2d 564, 567, n. 2, 568 and n. 7 (1st Cir. 1970).

**23.** The doctrines of "suspect classification" and "identifiable group" are theoretically related. "Suspectness" is directed at requiring a strong justification by the state of any classification disadvantaging a particular group "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio School District v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16, 40 (1973). *See also* Graham v. Richardson, 403 U.S. 365, 371–372, 91 S.Ct. 1848, 1851–52, 29 L.Ed.2d 534, 541–42 (1971). One would expect that such a class would be strongly identified by the attitudes toward it of its members and nonmembers alike. The clearest examples are racial and

ethnic groups and, perhaps, sexual groups. *See* Frontiero v. Richardson, *supra*, 411 U.S. at 682. Similarly, the clearest identifiable groups are racial and ethnic groups. Hernandez v. Texas, 347 U.S. 475, 478–480, 74 S.Ct. 667, 98 L.Ed. 866 (1954). There thus seems to be a strong argument that any group heretofore protected by the doctrine of "suspectness" should be presumed to be an identifiable group with the burden then shifted to defendants to disprove the existence of such an identifiable group within the relevant community. *Cf.* Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 197, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); White v. Regester, 412 U.S. 755, 767, 93 S. Ct. 2332, 37 L.Ed.2d 314 (1973); Bradley v. Judges of Superior Court, 372 F.Supp. 26, 31–34 (C.D.Cal. 1974).

**24.** As with the first claim, footnote 19, *supra*, the issue of whether judicial notice can be taken that women form an identifiable group and the question of whether this claim can be maintained as a class action will be decided in future proceedings. *Cf.* Bradley v. State of Texas, 470 F.2d 785, 788–789 (5th Cir. 1972).

neighborhoods excluded from participation."[25]

■ To the extent that the geographical data are offered as evidence of racial discrimination, this claim is superceded by the first claim above as to non-white ethnic minorities. In terms of economic discrimination, the alleged class is too ill-defined and over-inclusive to be considered an identifiable group in this litigation. Plaintiffs' allegations do not give a sufficient basis for a claim of discrimination on the basis of income against a properly defined economic class.[26] In considering claims of economic discrimination, a court applying the Equal Protection Clause must be able to determine the outlines of the allegedly disfavored class with considerable certainty if the rule of "suspect classifications" is to govern. *See* San Antonio School District v. Rodriguez, 411 U.S. 1, 18–29, 93 S.Ct. 1278, 1288–95, 36 L. Ed.2d 16, 34–41 (1973).

Plaintiffs have also failed to allege sufficient facts which, if true, would establish that residents of lower-strata neighborhoods are an identifiable group in geographical terms.[27] In United States v. Butera, 420 F.2d 564, 571–572 (1st Cir. 1970), the court, despite utilizing its federal supervisory power, with broader criteria than those constitutionally required,[28] refused to find an identifiable group in terms of county residence:

"While common experience tells us that people's attitudes differ to some degree along lines of age, sex and extent of education, we are not aware that they differ along county lines. * * * That term ["distinctness"] would have no meaning at all were we to say—in the absence of any supporting evidence —that residents of some counties have views and attitudes genuinely distinct from those of nearby counties."

■ The factual burden of establishing this class as an identifiable, distinct group is upon plaintiffs. "One method by which this may be demonstrated is by showing the attitude of the community." Hernandez v. Texas, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866, 870–71 (1954). Plaintiffs have not alleged facts pertaining to community attitudes, a factor which is, along with the attitudes, subjective identifications, and common interests of the putative group members, critical in de-

25. Complaint, p. 8.

26. The only support offered by plaintiffs is in an affidavit of James D. Reed, assistant director of the Community Design Center in San Francisco, which provides architectural and planning services to financially needy individuals and organizations. He found that lower-strata neighborhoods have the following characteristics:

"Large concentrations of non-white population, in most cases over fifty percent (50%) of the population; low median income, in most cases below eight thousand dollars ($8,000) per year; a low educational attainment factor; strong concentrations of blue-collar workers; high rates of unemployment; housing patterns characterized by large percentages of old and sub-standard rental housing, and a relatively low incidence of house ownership." Affidavit of James D. Reed, dated September 19, 1972, p. 2.

He recognized "minor deviations" in his geographical breakdown of San Francisco into lower, middle, and upper strata neighborhoods, but concluded that they were "minor" and that his categories "show in the most basic way the geographical divisions between San Francisco's lower, middle and upper strata populations." Affidavit, pp. 5–6.

These characteristics are certainly not meaningless, but they are insufficient, standing alone, to delineate an identifiable group in terms of which plaintiffs can offer statistical proof showing a prima facie case of discrimination in selecting grand jurors. *See* Hernandez v. Texas, 347 U.S. 475, 478–480, 74 S.Ct. 667, 670–71, 98 L.Ed. 866, 870–71 (1954). *See also* Penn v. Eubanks, 360 F. Supp. 699, 704 (M.D.Ala. 1973).

27. Cal.Penal Code § 899, which provides in relevant part that "[t]he names for the grand jury list shall be selected from the different wards, judicial districts, or supervisory districts of respective counties in proportion to the number of inhabitants therein * * *" does not apply to San Francisco. It is undisputed that San Francisco County is not divided into wards, judicial districts, or supervisorial districts.

28. See 420 F.2d at 567, n. 2, 568 and n. 7.

termining whether the class is a distinct, identifiable group. Instead plaintiffs have offered geographical delineations in lieu of more familiar criteria such as income, educational level, occupations, unemployment, and housing conditions.[29] *Cf.* Bradley v. Judges of the Superior Court, 372 F.Supp. 26, 33 (C.D. Cal. 1974). Plaintiffs' allegations fail to establish the parameters of an identifiable group for the purposes of this type of litigation.[30]

Defendants' motion to dismiss will be granted as to this claim.

### D. *Low-Income Blue-Collar Workers*

■ Plaintiffs' fourth class is comprised of low-income blue-collar workers. They have made, however, virtually no effort to define this class as a distinct, identifiable group in the community. It is evident from the complaint that plaintiffs exclude "insurance executives, presidents of corporations, union officials, real estate investors, independent businessmen, and other professional and white-collar sectors" and view "a part-time bank teller and a telephone repairman" as possible blue-collar workers.[31] Plaintiffs Hodges, MacShate, Yee, and Quadra seek to be the representatives of this class. Hodges and MacShate are community workers, and Yee and Quadra are secretaries.[32] From these allegations, the Court cannot discern the line which plaintiffs apparently draw between blue-collar and white-collar workers. To the extent that plaintiffs are attempting to construct a class of the poor or of persons with low incomes,[33] the

class they allege is too imprecise and undoubtedly over-inclusive. It is common knowledge that many workers in craft occupations earn very high annual incomes. It is surprising that plaintiffs would include community workers and secretaries in a class of blue-collar workers. If plaintiffs sought to represent a class of low-income recipients or of the poor, they should have alleged the criteria of that class and not the ambiguous term "blue-collar worker." Plaintiffs have not alleged facts pertaining to community attitudes which would give some content to this ill-defined group. *See* Hernandez v. Texas, 347 U.S. 475, 479–480, 74 S.Ct. 667, 671, 98 L.Ed. 866, 870–71 (1954). A class based on wealth distinctions must be more precisely delineated than this if it is to be an identifiable group. *Cf.* San Antonio School District v. Rodriguez, 411 U.S. 1, 18–29, 93 S.Ct. 1278, 1288–95, 36 L.Ed.2d 16, 34–41 (1973).[34]

The authorities offered by plaintiffs do not support their position. In United States v. DiTommaso, 405 F.2d 385, 392 (4th Cir. 1968), cert. denied, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969), the court found that, in comparison with their percentage of the eligible population, "blue collar workers" were substantially represented on the grand jury. There, however, the statistical studies which were used and which included a comparison of "blue collar" workers with "executive and professional" workers had been stipulated by the parties to be agreed exhibits. 405 F.2d at 387–388.

---

29. See footnote 26, *supra*. That is not to say that geographical groups could never be identifiable. *Cf.* Brooks v. Beto, 366 F.2d 1, 23 (5th Cir. 1966) (en banc), cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135, rehearing denied, 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618 (1967).

30. Plaintiffs have alleged that residents of lower-strata neighborhoods comprise 37% of the eligible population but only 10% of the grand jurors during the period 1960–1972. The significance of these statistics is not presently before the Court.

31. Complaint, p. 10.

32. Complaint, p. 3.

33. Plaintiffs begin the section of their complaint dealing with low-income blue-collar workers by observing that "[e]ven though *low-income families* comprise twenty-nine percent (29%) of the population of San Francisco, only 3.5% of the jurors in the last three (3) years have been *low-income representatives*." Complaint, p. 10 (emphasis added). Clearly plaintiffs are primarily concerned about the class of "low-income families", although they fail to allege the basis of making such a determination.

34. See also footnote 23, *supra*.

Here, in contrast, defendants dispute the allegation that low-income blue-collar workers are a distinct class.

In Thiel v. Southern Pacific Co., 328 U.S. 217, 221, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), the evidence showed that the persons selecting the petit jury in a civil case "deliberately and intentionally excluded from the jury lists all persons who work for a daily wage." Quite apart from the reliance of the Supreme Court on its federal supervisory power and the fact that the class of "daily wage earners" (which in *Thiel*, 328 U.S. at 222, included iron craft workers, bricklayers, carpenters, and machinists) is not co-extensive with low-income blue-collar workers, the class in *Thiel* was in fact defined by those who intentionally excluded members of the class. *Thiel* was not a case in which the class of daily wage-earners was found to be a distinct, identifiable group for determining whether a statistical disparity between their percentage of the eligible population and their representation on the grand jury was a prima facie case of discrimination in the selection of grand jurors.[35] The same is true of People v. White, 43 Cal. 2d 740, 752, 278 P.2d 9, 17 (1954), and of Labat v. Bennett, 365 F.2d 698, 713–716, 719–722 (5th Cir. 1966) (en banc), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967).

Therefore, defendants' motion to dismiss will be granted as to this claim.

### E. Young Adults: Persons Between the Ages of Twenty-One and Forty

Plaintiffs' final class is that of "young adults," those persons between the ages of twenty-one and forty.[36] Plaintiffs, again, however, have failed to allege facts which, if true, would establish this class as an identifiable group under Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866, 870 (1954).

Their primary authority is United States v. Butera, 420 F.2d 564, 569–570 (1st Cir. 1970), a decision based upon that court's federal supervisory power. The court held that young adults, those aged twenty-one to thirty-four, were "a cognizable—though admittedly ill-defined—group * * *" for the purposes of establishing a prima facie case. The court was concerned that otherwise "possible discrimination against a large class of persons * * * will be insulated from attack." This argument seems to beg the question to be decided: whether the class is a distinct, identifiable group in terms of which discrimination can be inferred from a statistical disparity. The court also took judicial notice, apparently, of "the contemporary national preoccupational with a 'generation gap,' which creates the impression that the attitudes of young adults are in some sense distinct from those of older adults." The use of this impressionistic judicial notice in conjunction with the broad federal supervisory power does not provide this Court with sufficient authority for plaintiffs' position.[37] Of greater significance is the unwillingness of the Court of Appeals for this Circuit to follow the *Butera* approach in a case involving a federal jury. United States v. Ross, 468 F.2d 1213, 1217–1218 and n. 4 (9th Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188

---

35. Thus, if a person selecting grand jurors intentionally excluded all left-handed persons, the exclusion would clearly be unconstitutional. That result, however, would not support a finding that left-handed persons form an identifiable group under Hernandez v. Texas, 347 U.S. 475, 479–480, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

36. Plaintiffs have alleged that their class of young adults constitutes 51% of the eligible population, but that its representation on the grand jury during the years 1970–1972 was only 12%.

37. United States v. DiTommaso, 405 F.2d 385, 391 (4th Cir. 1968), cert. denied, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969), and United States v. Bryant, 291 F.Supp. 542, 549–550 (D.Maine 1968), also fail to support plaintiffs' position. In *DiTommaso*, the parties agreed by stipulation to the exhibits containing the age categories. 405 F.2d at 387–388. The court did not hold that the different categories were identifiable groups. *Bryant* was affirmed sub nom. United States v. Butera, 420 F.2d 564 (1st Cir. 1970), which is discussed in the text.

(1973).[38] *But cf.* United States v. Hamling, 481 F.2d 307, 314 (9th Cir. 1973), cert. granted, 414 U.S. 1143, 94 S.Ct. 893, 39 L.Ed.2d 97 (1974). The Court in *Ross* noted that the reluctance of courts to recognize "young people" as a distinct group "is justified in light of the fact that the parameters of such a group are difficult to ascertain, as evidenced by the widely varying ages which have been used to define it, and that its membership and their values are constantly in flux." 468 F.2d at 1217. In *Ross,* appellant had offered the testimony of a sociologist and a psychiatrist for the proposition that persons aged twelve to twenty-five constitute a subculture in this society. The Court was unpersuaded, especially in light of testimony of these experts indicating a lack of cohesion in that age group and a lack of data on the subject.

If an age group were to be found an identifiable group, it would most likely be one spanning only a few years at most. *Ross* rejected a claim on the basis of a group between twenty-one and twenty-four. Plaintiffs present a claim on behalf of persons aged twenty-one to forty. Their claim, as alleged, cannot succeed.[39] Defendants' motion to dismiss will be granted as to this claim.

#### F. *Permission to Amend Complaint*

 The Court has granted defendants' motion to dismiss as to plaintiffs' claims pertaining to resid⌐nts of lower-strata neighborhoods, low-income blue-collar workers, and young adults aged twenty-one to forty. The dismissal of each class is based upon plaintiffs' failure to allege sufficient facts which, if true, would establish the classes as identifiable groups under Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670,

98 L.Ed. 866, 870 (1954). Since the defect is one of fact and not one of law, the dismissals cannot at this stage be with prejudice. *See* Conley v. Gibson, 355 U. S. 41, 45–46, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957); Bodine Produce, Inc. v. United Farm Workers Organizing Committee, 494 F.2d 541 (9th Cir. 1974). The nature of the issues, as described in the subsections above, "may suggest that the plaintiffs will have difficulty in establishing their case following further proceedings in the trial court, but it by no means establishes that there exists on the face of the complaint 'some insuperable bar to relief.' " Bodine Produce, Inc., *supra,* 494 F.2d at 562 (quoting Wright, Law of Federal Courts, 285–286 (2d ed. 1970)). Therefore, plaintiffs will be given leave to amend their complaint to the extent of alleging specific facts which, if true, would establish the classes of residents of lower-strata neighborhoods, low-income blue-collar workers, and young adults aged twenty-one to forty as identifiable groups. Plaintiffs will have thirty days from the date of this memorandum of opinion and order within which to amend.

#### V. *The Motions for Summary Judgment*

 To obtain summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that under the uncontroverted facts it is entitled to a judgment as a matter of law. Adickes v. Kress & Co., 398 U.S. 144, 158–161, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142, 154–56 (1970); Rule 56(c), Federal Rules of Civil Procedure. The factual material presented by a moving party "must be viewed in the light most favorable to the opposing party." *Adickes,*

---

38. *Ross* argued that persons aged twenty-one to twenty-four were systematically excluded from federal jury panels in this District, in which he had been convicted.

39. Defendants place reliance upon Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). But that case has no relevance to the specific issue before this

Court. The constitutionality of Congressional action was under scrutiny. The Supreme Court held the action invalid to the extent that it attempted to set age qualifications for voters in state elections. Nothing in Justice Black's decisive opinion, 400 U.S. at 119–131, has any impact on the law governing discrimination in selection of state grand jurors.

*supra,* 398 U.S. at 157. *See also* United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962). A summary judgment is appropriate only "where it is quite clear what the truth is * * *." Sartor v. Arkansas Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967, 972 (1944); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 460–61 (1962). "To satisfy the moving party's burden the evidentiary material before the court, if taken as true, must establish the absence of any genuine issue of material fact, and it must appear that there is no real question as to the credibility of the evidentiary material, so that it is to be taken as true." 6 Moore, Federal Practice ¶ 56.15 [3], at 2239 (2d ed. 1974) (footnotes omitted).

Under the law applicable in this case, plaintiffs must establish a significant statistical disparity and an opportunity for discrimination. Once they achieve that, they have made out a prima facie case, and the burden of proof shifts to defendants to explain or justify the disparity.[40] As parties moving for summary judgment, however, "the burden to show that there is no genuine issue of material fact rests on [them], whether [they] or [their] opponent would at trial have the burden of proof on the issue concerned; and rests on [them] whether [they are] by it required to show the existence or non-existence of facts." 6 Moore, *id.,* at 2342–2343. *But see* Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 748 (1974). By their memoranda and affidavits submitted on these motions, defendants have sufficiently alleged the defenses of explanation and justification to place the burden of showing no genuine issues of material fact as to those defenses on plaintiffs if they are to prevail on their summary judgment motion. *See* Doff v. Brunswick Corporation, 372

F.2d 801, 805 (9th Cir. 1967), cert. denied, 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed. 2d 71 (1967). *Cf.* United States v. Dibble, 429 F.2d 598, 601 (9th Cir. 1970)

Plaintiffs have offered no evidence which would tend to negate the possibility that there exists a sufficient factual explanation or justification of the statistical disparities. In addition, plaintiffs have not offered sufficient evidence of the credibility of their statistics to show that there is no genuine issue as to them. Their data are not derived from official sources, but rather through consultation with persons who have served on the grand jury.[41] The person who compiled the data has not been shown to be an expert in the field. She is identified as a research assistant and investigator at Public Advocates, Inc., in San Francisco, the organization with which plaintiffs' counsel, are associated. She has not explained in any detail her methodology in compiling the data. This is not a case, then, in which the statistics utilized by the moving party are derived from the opposing parties' records and in which the accuracy of the statistics is supported by the affidavits of experts. *See* Schreffler v. Bowles, 153 F.2d 1, 2–3 (10th Cir. 1946), cert. denied, 328 U.S. 870, 66 S.Ct. 1366, 90 L.Ed. 1640 (1946).

The statistics suffer from other defects. They are not complete: No statistics have been offered showing the representation of non-white ethnic minorities in the grand-jury pool. Such data would be significant in determining how the representation of the group changed at different points in the selection process, as in Alexander v. Louisiana, 405 U.S. 625, 629–630, 92 S.Ct. 1221, 1224–25, 31 L.Ed.2d 536, 541 (1972). That determination would aid an evaluation of the cause of the statistical disparity, especially in pinpointing which opportunity for discrimination was the critical one. Plaintiffs also have not supplied a factual basis for their population figures. It is not clear whether they are using aver-

40. See pp. 613–617, *supra.*

41. See affidavit of Carol Levine, who compiled the statistics, dated September 15, 1972.

age figures over the 1960–1972 time span or are using data from the 1970 or 1960 census. There have been population changes between 1960 and 1970 [42] which may be significant in evaluating the statistical disparities over those years. Finally, plaintiffs have not offered an expert statistical analysis of their data showing the improbability that the disparities were the result of chance or accident. *See* Alexander v. Louisiana, *supra,* 405 U.S. at 630 and n. 9; Whitus v. Georgia, 385 U.S. 545, 551, n. 2, 87 S.Ct. 643, 647, 17 L.Ed.2d 599, 604–05 (1967); Smith v. Yeager, 465 F.2d 272, 278 and n. 16 (3rd Cir. 1972), cert. denied, sub nom. New Jersey v. Smith, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972).

Plaintiffs have failed to show that there is no genuine question of fact as to material issues in this action, and therefore their motion for summary judgment must be denied. The Court also finds that no material facts are "without substantial controversy" as provided under Rule 56(d) and that plaintiffs' motion for partial summary judgment must also be denied. Prior to the evidentiary hearing in this case, the parties will prepare a pretrial order in which they will stipulate which facts are not in dispute. See Rule 16, Federal Rules of Civil Procedure.

Defendants' motion for summary judgment must also be denied. If plaintiffs' allegations are true, they have stated a prima facie case with respect to nonwhite ethnic minorities and women. Defendants have not submitted data of a kind which would conclusively show that there have not been significant statisti-cal disparities with respect to those two classes. They cannot succeed upon a motion for summary judgment by attempting a factual explanation or justification of the disparities where that explanation is controverted. That issue must be decided by a trier of fact.

Defendants have offered some arguments, however, which the Court finds legally insufficient in rebuttal. They argue, for instance, that the statistics covering the thirteen-year period are irrelevant in that during recent years minority groups have been adequately represented and that the personnel of the Superior Court has changed from the earlier years.[43] These statistics clearly are relevant to plaintiffs' attempt to show systematic, though unintentional, exclusion of certain groups. Disparities persisting over many years can add substantial weight to their claims.

Defendants next argue that California grand juries have, apart from their function in the criminal-justice system, a civil function in investigating and evaluating the operations of the county and cities located within the county.[44] Thus, they contend, "the Superior Court Judges have realized, and responded positively to, the need for providing Grand Juries with persons who have some knowledge of and expertise in the area of business managment."[45] Their argument, in effect, is that the grand jury they select plays a quasi-legislative or quasi-executive function as a watchdog committee and that this distinction from most state grand juries and all federal grand juries [46] should mean that different, more permissive selection procedures should be allowed in their case.

---

42. See Appendix B.

43. Defendants do not argue mootness, however. *Compare* Blackwell v. Thomas, 476 F.2d 443, 444–446 (4th Cir. 1973).

44. *See* Cal.Penal Code §§ 914.1, 919, 920, 925, 925a, 927, 928, 929, 932, 933, 933.5; Cal. Government Code § 3060 et seq.

45. Defendants' Memorandum filed November 15, 1972, p. 4.

46. "Only California and Nevada mandate that grand juries be empanelled annually to spe-cifically function as a 'watchdog' over county government and, in addition, to hear evidence to determine whether an indictment should be returned." Peterson, The California Grand Jury System: A Review and Suggestions for Reform, 5 Pacific L.J. 1, 2 (1974) (footnotes omitted). Seven other states provide in a limited way for grand-jury investigations of county government beyond instances of "willful misconduct by public officials." *Id.*

This Court is not faced with the question of whether a grand jury exercising only an investigatory function would still fall within the law that has developed concerning discrimination in the selection of grand jurors. This case also does not involve discretionary appointments by an elected executive official.[47] *See* Mayor of the City of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); Carter v. Jury Commission, 396 U.S. 320, 337–339, 90 S.Ct. 518, 527–28, 24 L.Ed.2d 549, 561–63 (1970).

■■ The State is not compelled to have one grand jury function both as an indicting and as an investigatory and reporting body.[48] Nor, for that matter, is it compelled by the federal constitution to have a grand jury at all. Hurtado v. California, 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232, 239 (1884); Peters v. Kiff, 407 U.S. 493, 496, 92 S.Ct. 2163, 2165, 33 L.Ed.2d 83, 90 (1972) (opinion of Marshall, J.); Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 1227, 31 L.Ed.2d 536, 543–44 (1972). But, if it chooses to have a grand jury, it must ensure that its selection practices do not violate federal constitutional guarantees. Carter v. Jury Commission, 396 U.S. 320, 330, 90 S.Ct.

518, 523, 24 L.Ed.2d 549, 557–58 (1970); Smith v. Yeager, 465 F.2d 272, 275 (3rd Cir. 1972), cert. denied, sub. nom. New Jersey v. Smith, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972). It cannot secure a change in those constitutional standards nor immunize its selection practice from those standards by adding other functions to the traditional criminal grand jury.[49]

■ Defendants' argument that they have acted in good faith (not disputed by plaintiffs) and that they have conscientiously tried to include representatives of minority groups among their nominees is not sufficient to rebut a prima facie case of discrimination in the selection of grand jurors.[50]

Therefore defendants have failed to show that there is no genuine issue of material fact, and their motion for summary judgment must be denied.

■ The denial of these motions is also supported by another significant consideration. The issues in this action include civil-rights claims and judicial questions of federalism in the form of a federal court reviewing procedures found to be appropriate by state judges in their selection of grand jurors. These are important and sensitive public issues which

47. Defendants stress that Superior Court judges are either elected or appointed by the Governor and must face election every six years. Those elected, they emphasize, "are vested with the legitimacy of the electoral process. And their's is the mandate of the people." Defendants' Memorandum filed November 15, 1972, p. 13. But the fact that a majority of the citizens may have elected the persons who select grand jurors does not immunize their selection practices from scrutiny under the Equal Protection Clause. Indeed, close judicial scrutiny of such practices is especially necessary when the groups allegedly adversely affected may not be able to use the political process to protect their interests. *See* Hunter v. Erickson, 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616, 622–23 (1969).

48. There have been legislative proposals for a change to a system using two different panels, each performing only one of these functions. *See* Petersen, footnote 46, *supra*, at 6–8.

49. The San Francisco grand jury plays a significant, if gradually diminishing, role in the criminal justice system. The following information, provided by defendants, gives some indication of that role:

Criminal Cases Filed in Superior Court in San Francisco

| Fiscal Year | Indictments | Informations |
|---|---|---|
| 1962–63 | 222 | 1805 |
| 1963–64 | 242 | 1664 |
| 1964–65 | 228 | 1836 |
| 1965–66 | 234 | 2155 |
| 1966–67 | (Not available) | —— |
| 1967–68 | 232 | 1932 |
| 1968–69 | 154 | 2146 |
| 1969–70 | 164 | 2178 |
| 1970–71 | 113 | 2678 |
| 1971–72 | 79 | 2396 |
| 1972–73 | 58 | 2098 |

50. See the discussion at pp. 615–616, *supra*.

should not be decided until the Court determines with confidence what the facts are, "what the truth is * * *." Sartor v. Arkansas Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967, 972 (1944). See also Kennedy v. Silas Mason Co., 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347, 1350–51 (1948). These motions for summary judgment have not put the Court into that position.

## VI. *Pendent Jurisdiction*

 Plaintiffs have not offered any authorities in support of their third cause of action based on provisions of the California Constitution, Article I, §§ 11, 21. The federal claim in this action is certainly substantial and the federal and state claims do "derive from a common nucleus of operative fact." Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 227–28 (1966). Though the Court thus has the power to decide the state claim, it also has broad discretion in determining whether to exercise that power. *Gibbs, supra,* 383 U.S. at 726; Moor v. County of Alameda, 411 U.S. 693, 716, 93 S.Ct. 1785, 1798, 36 L.Ed.2d 596, 613 (1973). The main factors the Court must consider in exercising its discretion are "judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims * * *. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs, supra,* 383 U.S. at 726 (footnote omitted). *See also Moor, supra,* 411 U.S. at 715–716.

Before this case reaches the trial stage, the substance of this third cause of action must be determined. If the content of Article I, §§ 11 and 21, differs from that of the Equal Protection Clause in the context of alleged discrimination in the selection of grand jurors, then it may be that the state claim should be decided first to avoid, perhaps, the federal question. *See* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

Perhaps abstention would be warranted. *See* Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 857, 28 L.Ed.2d 196, 198–99 (1971); Reetz v. Bozanich, 397 U.S. 82, 86–7 (1970); Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, 641, 79 S.Ct. 455, 457, 3 L.Ed.2d 562, 563–64 (1959). If the content of the state provisions does not differ from federal law in this area,[51] the third cause of action will be dismissed.

## ORDER

It is hereby ordered that plaintiffs' first cause of action is dismissed.

It is hereby further ordered that plaintiffs' second cause of action is dismissed as to defendant Superior Court of the City and County of San Francisco.

It is hereby further ordered that plaintiffs' complaint is dismissed with respect to the claims based on the classes of residents of lower-strata neighborhoods, low-income blue-collar workers, and young adults aged twenty-one to forty.

It is hereby further ordered that plaintiffs are given leave to amend their complaint with respect to facts supporting the existence as identifiable groups of residents of lower-strata neighborhoods, low-income blue-collar workers, and young adults aged twenty-one to forty, as provided in the memorandum of opinion at page 623.

It is hereby further ordered that plaintiffs' motions for summary judgment

---

51. *See* Department of Mental Hygiene v. Kirchner, 62 Cal.2d 586, 588, 43 Cal.Rptr. 329, 330 (1965). But *compare* Serrano v. Priest, 5 Cal.3d 584, 596, n. 11, 96 Cal.Rptr. 601, 609, n. 11 (1971), *with* San Antonio School District v. Rodriguez, 411 U.S. 1, 27–28 and n. 65, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

and, alternatively, for partial summary judgment are denied.

It is hereby further ordered that defendants' motion for summary judgment is denied.

It is hereby further ordered that defendants' motion to dismiss is denied as to plaintiffs' claims as to non-white ethnic minorities and women.

It is hereby further ordered that a preliminary pretrial conference will be held on June 28, 1974, at 3:30 P.M., and that the parties should prepare and exchange agenda for that conference, which should be filed by June 24, 1974, and which should contain a proposed schedule for the remaining stages of this litigation.

## APPENDIX A

### PLAINTIFFS' ALLEGATIONS AS TO GRAND-JURY PARTICIPATION OF FIVE CLASSES, 1960–1973 [1]

| Year | Women | Non-white Ethnic Minorities [2,3] | Blacks | Asians [3] | Latinos [2] | Low-Income Blue-Collar Workers [4] | Young Adults [4] | Residents of Lower-Strata Neighborhoods [5] |
|------|-------|-----------------------------------|--------|-----------|------------|-------------------------------------|-------------------|---------------------------------------------|
| 1960 | 2(11%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1961 | 3(16%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1962 | 1(5%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1963 | 1(5%) | 0(0%) | 0(0%) | -- | -- | -- | -- | -- |
| 1964 | 5(26%) | 0(0%) | 0(0%) | -- | -- | -- | -- | -- |
| 1965 | 4(21%) | 0(0%) | 0(0%) | -- | -- | -- | -- | -- |
| 1966 | 3(16%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1967 | 2(11%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1968 | 1(5%) | 1(5%) | 1(5%) | -- | -- | -- | -- | -- |
| 1969 | 3(16%) | 0(0%) | 0(0%) | -- | -- | -- | -- | -- |
| 1970 | 1(5%) | 1(5%) | 0(0%) | 1(5%) | -- | 1(5%) | 2(11%) | -- |
| 1971 | 2(11%) | 6(32%) | 3(16%) | 3(16%) | -- | 0(0%) | 3(16%) | -- |
| 1972 | 3(16%) | 4(21%) | 3(16%) | 1(5%)[7] | -- | 2(11%) | 2(11%) | -- |
| 1973 | 5(26%) | 4–5[6](21–26%) | 3(16%) | 0(0%) | 1–2[6] (5–11%) | 1(5%) | -- | 1(5%) |

1. The data are assembled in this form by the Court based upon references in plaintiffs' pleadings.
2. Plaintiffs allege that one Latino served on the grand jury during the years 1960–1972 but do not specify the year.
3. One Asian served during the years 1960–1969, but plaintiffs do not specify the year.
4. Plaintiffs allege facts only as to the period 1970–1973.
5. Plaintiffs allege only that 24 residents of lower-strata neighborhoods served on the grand jury over the period 1960–1972 (approximately 10% of total number of persons serving), but do not give yearly figures.
6. The parties differ on the presence of one person with a Spanish surname.
7. One Filipino served on the 1972 grand jury also. Affidavit of defendant Bernard J. Ward, dated November 14, 1972.

## APPENDIX B

## POPULATION STATISTICS

A. *Plaintiffs' Allegations as to Percentage of Each Class in Eligible Population in San Francisco*

| | | |
|---|---|---|
| Non-white ethnic minorities | | 32.3% |
| Blacks | 13.4% | |
| Asians | 9.4% | |
| Latinos | 9.5% | |
| Women | | 53% |
| Residents of lower-strata neighborhoods | | 37% [1] |
| Low-income blue-collar workers | | 29% [2] |
| Young adults aged twenty-one to forty | | 51% |

[1] Percentage of total county population.

[2] Percentage of low-income families in total county population.

B. *Population of City and County of San Francisco—Census Data*

| | 1970 | | 1960 | |
|---|---|---|---|---|
| | Total | Percentage [1] | Total | Percentage [1] |
| Total [2] | 715,674 [3] | | 740,316 [6] | |
| Male | 345,680 [3] | 48% | 363,424 [6] | 49% |
| Female | 369,994 [3] | 52% | 376,892 [6] | 51% |
| White | 511,186 [4] | 71% | 604,403 [6] | 82% |
| Black | 96,078 [4] | 13% | 74,383 [6] | 10% |
| Japanese | 11,705 [4] | 2% | 9,464 [7] | 1.2% |
| Chinese | 56,696 [4] | 8% | 36,445 [7] | 5% |
| Filipino | 24,694 [4] | 3.5% | 12,327 [7] | 1.6% |
| Indian | 2,900 [4] | 0.4% | 1,068 [7] | 0.1% |
| Other non-white | 10,415 [4] | 1.4% | 2,226 [7] | 0.3% |
| Spanish surname or language | 101,901 [4] | 14% | 51,602 [9] | 7% |
| Persons aged 21–39 | 207,300 [5] | 29% | 189,927 [8] | 26% |

1. Percentages are approximate and were calculated by the Court.

2. The population figures here are not those of the persons eligible for grand-jury service, but are of the total population in the City and County of San Francisco.

3. U.S. Bureau of the Census, Census of Population: 1970, Vol. 1, Characteristics of the Population, Part 6, California—Section 1 (1973), Table 34, p. 311.

4. *Id.*, Table 129, p. 1078.

5. *Id.*, Table 24, p. 155. Plaintiffs' alleged class covers the 21–40 age group. The data available allowed calculations with respect to the 21–39 group only.

6. U.S. Bureau of the Census, U.S. Census of Population: 1960, Vol. 1, Characteristics of Population, Part 6, California (1963), Table 25, p. 168.

7. *Id.*, Table 28, p. 198.

8. *Id.*, Table 27, p. 189.

9. U.S. Bureau of the Census, U.S. Census of Population: 1960, Subject Reports, Persons of Spanish Surname, Table 15, p. 195 (1963).

## APPENDIX C

### PROPOSED RULE RE GRAND JURY

Section 1. A Grand Jury shall be drawn and impaneled once each calendar year by the Presiding Judge in Department One of the Superior Court.

Section 2. The Superior Court of the State of California in and for the City and County of San Francisco hereby reduces to writing and reaffirms its existing policy in regard to the selection of grand jurors as follows:

Neither the Court as a whole nor any individual judge thereof shall pursue a course of conduct which necessarily results in discrimination in the selection of jurors on economic, social, religious, racial or sexual groups or classes in the community at large.

Each judge shall make an adequate effort to acquaint himself with the qualifications of eligible jurors of the foregoing groups or classes in order to comply with the constitutional mandate that the jury be selected in such a way that there has been neither inclusion nor exclusion because of membership in any of the foregoing groups or classes. The judges shall not stop with their personal acquaintances. Each judge shall endeavor to make his nominees for grand jury service broadly representative of the community.

Volunteers for service as grand jurors will receive equal consideration.

Section 3.

(a) On or before the first court day in October of each year, each Judge of this court may nominate and transmit to the Presiding Judge the names of five persons to be placed upon a list, together with the names of the volunteers who have qualified in accordance with subsection (b) hereof, from which the court shall select the persons from whom the Grand Jury for the ensuing year shall be drawn. The persons so nominated shall be persons qualified for such selection under the provisions of Part 2, Title 4, Chapter 2, Articles 1 and 2 of the Penal Code, and the provisions of the Code of Civil Procedure referred to therein. The nominations shall be made in writing and shall state the name, approximate age, residence address, and occupation of each person nominated.

(b) During the fiscal year ending on the first court day in October, the Executive Officer and his assistants shall accept the names and addresses of all persons volunteering for service as grand jurors. Before the name of any person who has so volunteered shall be transmitted by the Executive Officer to the Presiding Judge, he shall ascertain whether such person is qualified for selection as a grand juror under the provisions of Part 2, Title 4, Chapter 2, Articles 1 and 2 of the Penal Code and the provisions of the Code of Civil Procedure referred to therein. From those persons so qualified, the Executive Officer shall select by lot a number not to exceed the number of nominees nominated pursuant to paragraph (a) of this section. Said number shall be added to the list of nominees named by the judges in accordance with paragraph (a) of this section.

Section 4. The Presiding Judge promptly shall have the entire list of nominees thus submitted mimeographed in a form that will show

which judge nominated each of the nominees and which of the nominees are volunteers. One copy of this list shall be placed forthwith in the hands of each judge, and copies of it shall be furnished to the press. Such list shall be filed forthwith with the Executive Officer, where it shall be open to public inspection.

Section 5. The Presiding Judge shall appoint a "Committee on Selection of Grand Jurors" to whom objection to any nominee may be communicated by any judge or other person, and the names of the members of such committee shall be filed with the Executive Officer where it shall be open to public inspection.

Section 6. The entire list of nominees shall be placed in the hands of the Executive Officer who shall conduct such interviews and make such preliminary investigation of the nominees as may be directed by the Committee on Selection of Grand Jurors. Additionally, each judge shall make such investigation of the prospective grand jurors as he may deem appropriate and may communicate to the Committee on Selection of Grand Jurors his objections to any nominee. Any other person may furnish to such committee information concerning any nominee. Such committee shall transmit any objection received from a judge or other person to the judge who nominated the prospective grand juror concerning whom the objection was made and shall transmit to the Presiding Judge any objection received from a judge or other person as to any nominee who has volunteered for service as a grand juror. Any judge may withdraw the name of any nominee submitted by him by informing such committee of such withdrawal.

Section 7.

(a) On or before November 30, the Committee on Selection of Grand Jurors shall present to the Presiding Judge a written report concerning each nominee for the grand jury, and shall set forth therein all objections to any nominee whose name has not been withdrawn, received from judges of this court, and shall set forth objections or information received from any other source, together with the Committee's recommendation as to whether the name shall be retained on the list. The report shall be deemed confidential and shall not be disclosed to the public. If any such objection or any reply thereto b[y] the nominating judge is in writing, it shall be transmitted with the report. The Committee on Selection of Grand Jurors shall endeavor to select for Grand Jury service those nominees who are broadly representative of the community.

(b) Upon receipt of said report, the Presiding Judge shall call a meeting of the judges, to be held on or before the first Tuesday following the 1st day of January for the purpose of selecting a grand jury list. At said meeting the names of all nominees which have not been withdrawn, as provided in Section 6 of this rule, together with the report of the Committee on Selection of Grand Jurors, shall be presented to and considered by the judges. Those nominees who are approved by a majority of the judges of this court shall be placed upon, and their names shall constitute, the grand jury list. The approved list, when adopted as above provided, shall be filed with the County Clerk and made a public record.