**Harold R. HOKE, Plaintiff,**

v.

**BOARD OF MEDICAL EXAMINERS OF
the STATE OF NORTH CAROLINA
et al., Defendants.**

**No. C-C-75-01.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 6, 1975.

Roy Lucas, Washington, D. C., and
Adam Stein, Chapel Hill, N. C., for plaintiff.

John H. Anderson and Henry A.
Mitchell, Jr., Raleigh, N. C., and Harry

C. Hewson, Charlotte, N. C., for defendants.

Before CRAVEN, Circuit Judge, JONES, Chief District Judge, and McMILLAN, District Judge.

CRAVEN, Circuit Judge:

This three-judge court was convened to consider a doctor's attack on certain aspects of the procedure pursuant to which the state's Board of Medical Examiners (the Board) revokes a license to practice medicine. Sought, *inter alia*, is permanent injunctive and declaratory relief against provisions allegedly defective under the fourteenth amendment's due process clause.

The plaintiff, Dr. Harold Hoke, has since November 1973 operated Hallmark Clinic, a private abortion clinic in Charlotte, North Carolina. On September 20, 1974, the Board noticed in writing nineteen "Charges and Allegations," all of which, as paragraph 19 itself alleged, showed that Dr. Hoke had "engaged in dishonorable and unprofessional conduct unworthy of and affecting" his practice and that therefore grounds existed for revocation of his license.[1]

The complaint[2] sets out two levels of attack on the Board's move to revoke Hoke's license. As to the revocation *procedure:* (a) the Board's combined role under the statute[3] as investigator,

1. The numbered charges, with varying degrees of specificity, alleged in substance that Hoke had negligently handled patients undergoing abortion; had performed abortions without adequate pregnancy tests; had knowingly performed spurious abortions; had solicited false accusations against other doctors in disputes arising in Charlotte and Cartersville, Georgia, where Hoke had previously practiced; had solicited medical practice through a brochure describing Hallmark Clinic, which contained false representations; and finally that his mental condition rendered him unable safely to practice medicine.

The complaint informed Hoke that a public hearing to determine the truth of the charges would be held on October 30, 1974, at which time he could appear with counsel, cross-examine witnesses, and present his own evidence. He was also invited to file a written response to the charges. The hearing was later postponed until February 10, 1975.

2. Filed January 2, 1975, the complaint also requested a temporary restraining order against the proposed Board hearing on February 10, 1975. It was not necessary to enter such an order, however, since the Board agreed to postpone the hearing at least until this court had rendered a decision.

3. N.C.Gen.Stats. § 90–14 (Supp.1971) provides:

The Board shall have the power to revoke and rescind any license granted by it, when, after due notice and hearing, it shall find that any physician licensed by it has been guilty of grossly immoral conduct, or of producing or attempting to produce a criminal abortion, or, by false and fraudulent representations, has obtained or attempted to obtain, practice in his profession, or is habitually addicted to the use of morphine, cocaine or other narcotic drugs, or is habitually addicted to the use of marijuana, barbiturates, demerol or any other habit-forming drug or derivative of such drug, or has by false and frudulent representations of his professional skill obtained, or attempted to obtain, money or anything of value, or has advertised or held himself out under a name other than his own, or has advertised or publicly professed to treat human ailments under a system or school of treatment or practice other than that for which he holds an earned diploma or degree, or is guilty of any fraud or deceit by which he was admitted to practice, or has been guilty of any unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession, or has been convicted in any court, state or federal, of any felony or other criminal offense involving moral turpitude, or has been adjudicated a mental incompetent or whose mental condition renders him unable safely to practice medicine. Upon the hearing before said Board of any charge involving a conviction of such felony or other criminal offense, a transcript of the record thereof certified by the clerk of the court in which such conviction is had, shall be sufficient evidence to justify the revocation or rescinding of such license. And, for any of the above reasons, the said Board of Medical Examiners may refuse to issue a license to an applicant. The findings and actions of the Board of Medical Examiners in revoking or rescinding and refusing to issue licenses under this section, shall be subject to review upon appeal to the superior court, as hereinafter provided in this article. The Board of Medical Examiners may, in its discretion, and upon such terms and conditions and

prosecutor, and judge renders it inherently biased; (b) the statutory standard—"unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession"—is vague and overbroad; and (c) since, assertedly, his former patients could constitutionally refuse to appeal at a "public"[4] hearing—claiming infringement of their right of privacy under *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) —*his* right to present witnesses in his own behalf will be substantially impaired. Secondly, many of the specific *substantive* charges would, if revocation were based at least in part thereon, infringe his constitutional rights under the first, fifth, and fourteenth amendments.[5]

Hoke's prayer for relief is specific: a permanent injunction prohibiting the Board from proceeding against him under the September 1974 charges;[6] a declaratory judgment that § 90–14 violates the due process clause for the aforementioned reasons; an order requiring any Board hearing to be held *in camera;* and declaratory relief (and in two instances injunctions) against the constitutionally defective charges.

■■ As a three-judge court, in the present posture of this case, we need reach only the claim that § 90–14, the underlying authority for the proceeding against Hoke, is itself violative of the due process clause. Whether a subsequent revocation based wholly or in part upon charges implicating Hoke's constitutional rights would be void is a question which, assuming ripeness at this stage, would not turn on the unconstitutionality of a state *statute,*[7] *i. e.,* § 90–

---

for such period of time as it may prescribe, restore a license so revoked and rescinded.

4. N.C.Gen.Stats. § 90–14.2 (1965) directs the Board to hold a public hearing on the charges. The Charlotte Observer, in connection with Hoke's case, sued the Board in state court to enjoin the Board's apparent practice of conducting the hearing in private when the doctor requested it. The court found § 90–14.2's language mandatory and entered an injunction in favor of the newspaper. The Board apparently did not appeal.

5. *E. g.,* Hoke asserts that ¶s 6 and 8 are unconstitutionally vague because they accuse him of performing spurious abortions on "various" females, without specifying names, dates, or other particular circumstances; that ¶ 16 charging unethical advertising and solicitation simply by distribution of a pamphlet describing Hallmark's services is void under the first amendment. Many of the charges of inadequate and unprofessional testing and operating procedures are challenged both as subjecting Hoke to standards that have never been applied to other doctors and as interfering with the freedom of discretion, in the doctor-patient relationship, that is necessarily protected by Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

6. Two more charges were brought and noticed to Hoke in December 1974, one alleging unnecessary surgery and the other relating to a misdemeanor charge in Georgia. The present record does not reveal the wording of these latest charges.

7. 28 U.S.C. § 2281 provides:

An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

The distinction set out in *Ex parte* Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940), is applicable here:

It is necessary to distinguish between a petition for injunction on the ground of the unconstitutionality of a statute as applied, which requires a three-judge court, and a petition which seeks an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional. The latter petition does not require a three-judge court. In such a case the attack is aimed at an allegedly erroneous administrative action.

310 U.S. at 361, 60 S.Ct. at 951 (footnotes omitted). *See also* Steffel v. Thompson, 415 U.S. 452, 457, n. 7, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 968–70 (2d ed. 1973).

14. Any injunctive relief prohibiting the Board from basing revocation, say, on Hoke's distribution of a brochure, as protected by the first amendment, could be granted by a single judge without reaching § 90–14. Whether an order requiring an *in camera* hearing—contrary to § 90–14.2 as construed by the state court —can or should issue is a question which, assuming it touches upon the constitutionality of § 90–14.2 as applied, is not, as we view the record, ripe for adjudication at this stage.[8] Hoke's claim that he will be deprived of the right to present evidence on his behalf depends at least on: the nature of the evidence presented against him; the extent to which that evidence could be arguably rebutted by his former patients; whether and to what extent those patients have a privilege of refusing to testify or even appear; and the extent to which that privilege, if recognized, is asserted. The most Hoke can assert at this stage is that it is conceivable that on review of a then-completed public revocation hearing a court could conclude that Hoke's defense was so materially disabled as to deny him due process. The question is presently wholly speculative, and we decline to consider it.

Thus, reaching the twin charge that § 90–14 impermissibly co-mingles investigatory, prosecutorial, and adjudicatory functions and grounds revocation upon a vague and overbroad standard, for reasons which follow we deny the requested injunctive relief and remand to the single-judge court for its resolution of those particularized claims not requiring our attention under 28 U.S.C. § 2281.

### I.

Hoke alleges that, according to standard practice, each member of the Board to some degree participated in the preceding months in the investigation and development of the facts which ultimately led to the September 1974 charges;[9] that each member after this review voted to prefer charges; and that each member of the seven-man Board plans to sit in judgment on the validity of the charges. In exposing the Board to one side of the facts and implicitly requiring it to make a kind of probable cause determination, this procedure, in his view, creates an inherent bias towards vindicating the Board's initial judgment when it sits as final adjudicator. The Board's procedure under § 90–14, therefore, deprives an accused physician of the due process right to have disputed facts weighed and evaluated by an impartial hearing body.

Hoke's position rested primarily on *Larkin v. Withrow*, 368 F.Supp. 796 (E. D.Wis.1973) (three-judge court).[10] The Wisconsin scheme authorized the state's medical hearing board to "investigate, hear and act upon practices" by doctors and order temporary suspensions.[11] Since the statute co-mingled the three functions the doctor stood to lose his liberty or property without "the intervention of an independent, neutral and detached decision maker." 368 F.Supp. at 797. Finding imminent ir-

8. *See, e. g.*, Golden v. Zwickler, 394 U.S. 103, 108–10, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

9. In light of the subsequent deposition of the Board's retained attorney, John Anderson, that he performed most of the investigative groundwork and thereafter presented the results to the Board, Hoke in his supplemental memorandum has softened his initial allegation somewhat. But while there might be a dispute on the facts, we deem it immaterial for purposes of our analysis. *See* Withrow v. Larkin, 421 U.S. 35, 54 n. 20, 95 S.Ct.

1456, 43 L.Ed.2d 712 (1975), discussed *infra*. We also note that the Board has recently hired a full-time investigator, but that change, if induced by Hoke's action, does not affect our decision. *Id.*, 421 U.S. at 46 n. 13, 95 S.Ct. 1456.

10. *See also* Larkin v. Withrow, 368 F.Supp. 793 (E.D.Wis.1973) (convening three-judge court).

11. The Wisconsin board was required to initiate proceedings through a district attorney in state court in order to effect a permanent revocation. 368 F.Supp. at 797.

reparable injury and a high likelihood of success on the merits, the court entered a preliminary injunction against further procedures under the challenged statute. Hoke has vigorously asserted that his case is identical with, if not stronger than, *Larkin v. Withrow, supra,* since here the Board can revoke and not simply suspend.

But how we might have applied the reasoning of the Wisconsin district court is irrelevant, for the Supreme Court has unequivocally and unanimously reversed. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). The Court noted previous cases in which "the adjudicator has a pecuniary interest in the outcome" or "has been the target of personal abuse or criticism from the party before him, "saying of them: "In [endeavoring to prevent even the probability of unfairness], various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable." *Id.,* 421 U.S. at 47, 95 S.Ct. at 1464. Distinguishing the Wisconsin doctor's argument, the Court stated:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.,* 421 U.S. at 47, 95 S.Ct. at 1464.

The Court rejected the doctor's attempt to show inherent bias, noting that, for example, the pretrial involvement of a judge in probable cause determinations has never been seen as barrier to that judge's presiding over a later trial or even sitting as the trier of fact. Also, administrative agencies typically receive the results of investigations, file charges, and sit at the subsequent hearing, all in conformity with the due process clause. *Id.,* 421 U.S. at 56, 95 S.Ct. 1456.

We are of course bound by the holding that the combination in an agency of investigative and adjudicatory functions does not itself violate due process, and we deem it controlling in this case. The only material difference in North Carolina's procedure is that the Board itself is empowered to revoke, whereas in Wisconsin the medical board could revoke only by instituting a quasi-criminal action.[12] But there is no suggestion in the Court's opinion that the combination of functions in Wisconsin's board presented less risk of actual bias because it could order only a temporary suspension, and that therefore combined functions in a board with permanent revocation power might be more vulnerable. The generality of the holding is in the opposite direction. "The initial charge or determination of probable cause and the *ultimate adjudication* have different bases and purposes. The fact that the *same agency* makes them in tandem and that they relate to the same issues does not result in a procedural due process violation." *Id.,* 421 U.S. at 58, 95 S.Ct. at 1470 (emphasis added). In other words, whether a medical board's ultimate decision results in temporary or permanent revocation, the due process analysis is the same.

Although we hold § 90–14 on its face and as generally applied to physicians does not deny due process

12. *See* n. 11 *supra.*

under *Withrow,* we note the Court's *caveat:* .

> That the combination of investigative and adjudicatory functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high. Findings of that kind made by judges with special insights into local realities are entitled to respect . . . .

*Id.,* 421 U.S. 58, 95 S.Ct. 1470. Hoke's complaint and supporting papers allude to the possibility that certain past and present members of the Board might be prejudiced against him because of prior litigation involving Charlotte Memorial Hospital,[13] of whose Executive Committee of the Visiting Staff" they are *ex officio* members. Hoke states that charges brought against him by the hospital in moving to deny him staff privileges "overlap almost 100% with the charges brought by the Board," thus raising the inference of a vendetta. We of course express no opinion on the ultimate validity of these assertions. But since the Supreme Court's reversal in *Withrow* of Hoke's primary authority has occurred so recently, is is understandable that Hoke's complaint and supporting memoranda do not address themselves to the theory of relief expressed in the *caveat.* And, in the present posture of this case, no facts have been found which would bear on the existence or non-existence of actual bias by certain Board members against Hoke.

For these reasons, on the remand to the single-judge court, Hoke should be given an opportunity to file, in good faith, amended pleadings directed to any "special facts and circumstances present in [this] case," from which the court might conclude, after finding the facts, that "the risk of unfairness [to Hoke] is intolerably high." *Id.,* 58 U.S. at ——, 95 S.Ct. at 1470. Since any relief Hoke might secure on this exception to *Withrow's* broad holding would not require injunctive relief against the Board on the basis that § *90–14* was unconstitutional, the single judge is empowered to adjudicate this claim, if raised.

## II.

Hoke's claim that § 90–14's standard for revocation is unconstitutionally vague and overboard merits little discussion. In *Jones v. Penny,* 387 F.Supp. 383 (M.D.N.C.1974) (Craven, J.), a three-judge court considered a vagueness attack on a motor vehicle code licensing provision applicable to those whose mental competency was suspect. The language "competent to operate a motor vehicle with safety to persons and property" was held sufficiently informative under the due process clause. *Id.,* 387 F.Supp. at 392. Cited as controlling were recent Supreme Court decisions upholding, against contentions of vagueness, "for such cause as will promote the efficiency of the service," *Arnett v. Kennedy,* 416 U.S. 134, 158, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974), and conduct "unbecoming an officer and a gentleman," *Parker v. Levy,* 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). Likewise, we find that § 90–14's language itself and in conjunction with established medical ethics sufficiently informs physicians of the standards by which they are to conduct themselves and their practice, and we so hold. As for overbreadth, Hoke's attack on § 90–14 only marginally raises first amendment claims. The charges against Hoke relate almost exclusively to his conduct. "Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if

---

13. *See* Poe v. Charlotte Memorial Hospital, Inc., 374 F.Supp. 1302 (W.D.N.C.1974); *cf.* Hallmark Clinic v. North Carolina Dept. of Human Resources, 380 F.Supp. 1153 (E.D. N.C.1974) (three-judge court).

the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . .' United *States Civil Service Comm'n v. National Association of Letter Carriers,* 413 U.S. 548, 580–581, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)." *Parker v. Levy, supra,* at 760, 94 S.Ct. at 2563. We therefore decline to invalidate § 90–14 as overbroad.

Accordingly, to the extent that Hoke's complaint rests on an attack on § 90–14 as violative of the due process clause, we deny the requested injunctive and declaratory relief. We otherwise remand to the single-judge court for further proceedings consistent with this opinion, namely, consideration of the claims that several of the specific charges, if revocation were predicated thereon, would deny Hoke's constitutional rights. Hoke should also be given the opportunity to amend his complaint to allege facts relevant to the *caveat* expressed in *Withrow*.

An appropriate judgment will be entered.